Filed 10/14/20  P. v. Henson CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C084770 |
| v. | (Super. Ct. Nos. SF132232E, STK-CR-FECOD-2015-0007347) |
| MARCUS HENSON, JR., | |
| Defendant and Appellant. | |

1

Defendant Marcus Henson, Jr., along with fellow gang members, fired 26 shots at a car with two Stockton Police officer occupants, Officers Travis Weber and Robert Barrington. A jury convicted defendant of two counts each of attempted murder of a peace officer, attempted murder, assault with a semiautomatic firearm on a peace officer, and assault with a semiautomatic firearm, and one count each of shooting at an occupied vehicle and active participation in a criminal street gang, with various enhancements. The trial court sentenced defendant to 50 years to life, plus eight months.

Defendant now contends (1) the convictions for attempted murder of Officer Barrington based on the kill zone theory must be reversed for (A) insufficiency of evidence and (B) instructional error; (2) the evidence was insufficient to establish defendant knew the targets were police officers; (3) the convictions for attempted murder and assault with a semiautomatic firearm must be vacated because those counts are lesser-included offenses of attempted murder of a peace officer and assault with a semiautomatic firearm on a peace officer; (4) the evidence was insufficient to sustain defendant's conviction for active participation in a criminal street gang and the true findings that the crimes were committed for the benefit of a gang; (5) the sentence for active participation in a criminal street gang must be stayed because it is based on the same conduct alleged in the other counts; (6) the judgment must be reversed because a leg restraint was used on defendant at trial without a showing of manifest need; (7) we must remand for a hearing to give defendant, who was 18 years old at the time of the crimes, an opportunity to present evidence relevant to an eventual youthful offender parole hearing; (8) we must remand to allow the trial court to exercise its newly-enacted discretion concerning whether to strike firearm enhancements; and (9) defendant is entitled to one additional day of presentence custody credit.

We conclude: (1) although the evidence was sufficient to support a conviction for attempted murder of Officer Barrington based on the kill zone theory, the trial court prejudicially erred by giving confusing and incomplete instructions on the kill zone

2

theory, requiring reversal of the convictions for attempted murder of Officer Barrington; (2) the evidence was sufficient to establish defendant knew the targets were peace officers; (3) the convictions for the lesser-included offenses (attempted murder and assault with a semiautomatic firearm with Officer Weber as the victim and assault with a semiautomatic firearm with Officer Barrington as the victim) must be vacated; (4) there was sufficient evidence of the gang's primary activities and of defendant's purpose to commit the crimes for the benefit of his gang; (5) the conviction for active participation in a criminal street gang was based on the same conduct as the other crimes, which requires a stay of the sentence for active participation in a criminal street gang; (6) if there was error in having defendant wear a leg restraint, any such error was harmless; (7) defendant will be entitled on remand to an opportunity to present evidence relevant to an eventual youthful offender parole hearing; (8) the trial court will have the opportunity on remand to exercise its newly-enacted discretion concerning whether to strike the firearm enhancements; and (9) defendant will have the opportunity at resentencing on remand to raise the issue of proper presentence credit for actual time served in custody.

Accordingly, we reverse the convictions for attempted murder of a peace officer and attempted murder as to Officer Barrington. We also vacate the convictions for attempted murder and assault with a semiautomatic firearm as to Officer Weber and the conviction for assault with a semiautomatic firearm as to Officer Barrington. And we vacate the sentence and remand for further proceedings consistent with this opinion.

BACKGROUND

Defendant is a member of the Flyboys criminal street gang in Stockton. He appears in pictures on social media making the Flyboys gang signs, and a prior gathering of Flyboys involving firearms occurred at defendant's home.

On June 26, 2015, a photograph was taken of defendant and some of his fellow gang members in Peterson Park. Some of them, including defendant, were making hand signs.

3

The same day, around 9 p.m., Stockton Police Officers Travis Weber and Robert Barrington, in plain clothes, were patrolling near Peterson Park in an unmarked police car, a green Pontiac, on which the front windows were lightly tinted. The same unmarked car had been used for several years by the Stockton Police Department around Peterson Park. Officer Weber drove the car with the driver's side window halfway down, and Officer Barrington was seated in the front passenger seat. Officer Weber knew, and was known by, men in the neighborhood from prior contacts. As Officers Weber and Barrington drove past a group of young men congregated on some bleachers at Peterson Park, Officer Weber heard one of the young men yell, "Cops," and the young men scattered in different directions. Officer Barrington did not remember anyone from the group of young men saying anything.

The officers parked about three blocks from the park to watch a residence. They saw someone walk out into the street and look in their direction. The officers followed a car that had been parked in the area of the residence they had been watching, but the driver drove in a circle and returned to the residence. The officers parked down the street to resume watching the residence. Officer Barrington believed the driver they followed in the car was conducting countersurveillance to see if he would be followed.

The same man as before continued to come out to the street and look at the officers. Believing the men were aware they were being watched, Officer Weber began to drive away when he saw a person crouching near a trailer. Officer Weber thought it might be an ambush, so he turned down a side street and accelerated. As he did so, the officers heard popping sounds and bullets flying past the car. Officer Weber heard at least three different firearms being discharged. The young men were within 20 to 30 yards from the officers when they began firing at the car.

Neither officer was injured in the attack, but the unmarked police car was hit twice in the rear bumper area. Later, 26 expended cartridges were found in the area near the

4

trailer. Five different firearms were used in the shooting, all either nine-millimeter or .40-caliber.

Before the shooting, neighbors saw several young men running and heard them talking about a laser having been aimed at them. One of the neighbors saw several young men, including defendant, huddled near her car on the street. As the unmarked police car approached them, the young men stood up and fired at the police car. Defendant fired using a black gun. After the shooting, the young men fled, some of them to Lawuan McDonald's house.

Responding officers found several Flyboys gang members (Lawuan McDonald, Jamal McKenzie, Christian Alcazar, and Qweshawn Fox) in the McDonald residence. Officers also found three firearms in the house.

One of the accomplices, Qweshawn Fox, testified at defendant's trial pursuant to a plea bargain. On the day of the attacks on the officers, he was with the other young men, including defendant, at Peterson Park when a green Pontiac slowly passed by. He claimed he did not know the car contained police officers; however, he and the others ran away. Fox heard one of the young men say he saw a red laser beam. Defendant went to his own residence, while Fox, Alcazar, McDonald, and McKenzie ran to McDonald's residence. Some of them armed themselves with firearms from McDonald's residence, and defendant arrived with a firearm.

The young men watched for the car. When it came up the street, defendant said, "Get ready." As the car approached, they began firing. After the car was gone, they fled and hid some of the firearms at the McDonald residence. Defendant continued up the street toward his own residence.

Defendant testified he is not a gang member and that the hand signs he is seen making in photographs are not gang signs. He admitted he was at Peterson Park on June 26, 2015, but he denied seeing the unmarked police car or participating in a

5

shooting. Defendant's wife and grandmother testified defendant was at home with them when they heard shots being fired in the neighborhood.

Defendant worked for two weeks at an agricultural packing company. There was no evidence defendant had ever had any other employment.

The jury convicted defendant on all 10 charged crimes:

- Count one: attempted murder of Robert Barrington, a peace officer (Pen. Code, §§ 664, subd. (e)/187, subd. (a)).[1]

- Count two: attempted murder of Travis Weber, a peace officer (§§ 664, subd. (e)/187, subd. (a)).

- Count three: attempted murder of Robert Barrington (§§ 664, subd. (a)/187, subd. (a)).

- Count four: attempted murder of Travis Weber (§§ 664, subd. (a)/187, subd. (a)).

- Count five: assault with a semiautomatic firearm on Robert Barrington, a peace officer (§ 245, subd. (d)(2)).

- Count six: assault with a semiautomatic firearm on Travis Weber, a peace officer (§ 245, subd. (d)(2)).

- Count seven: assault with a semiautomatic firearm on Robert Barrington (§ 245, subd. (b)).

- Count eight: assault with a semiautomatic firearm on Travis Weber (§ 245, subd. (b)).

- Count nine: shooting at an occupied vehicle (§ 246).

- Count ten: active participation in a criminal street gang (§ 186.22, subd. (a)).

As to counts one through four, the jury found true the allegations that (1) defendant personally discharged a firearm (§ 12022.53, subd. (c)), (2) a principal in the

---

[1] Undesignated statutory references are to the Penal Code.

crime discharged a firearm for the benefit of a gang (§ 12022.53, subd. (e)), (3) and defendant committed the crime for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)).

As to counts five through nine, the jury found true the allegations that defendant personally used a firearm (§ 12022.5, subd. (a)) and committed the crime for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)).

The trial court sentenced defendant to an aggregate indeterminate term of 50 years to life, plus an aggregate determinate term of eight months, consisting of the following: consecutive terms of 15 years to life for the two attempted murders of a peace officer (counts one and two), a consecutive term of 20 years for a firearm enhancement associated with count one under section 12022.53, subdivision (c), and a consecutive term of eight months for active participation in a criminal street gang. As to the remaining counts and enhancements (including firearm and gang enhancements), the trial court either imposed but stayed the terms or imposed them concurrently.

Additional facts will be recounted in the discussion as relevant to defendant's contentions on appeal.

DISCUSSION

I

The trial court instructed the jury on the kill zone theory, telling the jury, among other things: "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or kill zone." Defendant now challenges his conviction for attempted murder of Officer Barrington, who was the passenger in the green Pontiac, based on the kill zone theory on two grounds: (A) insufficiency of evidence, and (B) instructional error.

7

## A

" 'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.)  We presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence.  (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)  We reverse for lack of substantial evidence only if " 'upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331 (*Bolin*).)

Attempted murder requires the specific intent to kill.  (*People v. Canizales* (2019) 7 Cal.5th 591, 602 (*Canizales*).)  The specific intent to kill may be inferred under the concurrent intent (or kill zone) theory.  (*Ibid*.; *People v. Bland* (2002) 28 Cal.4th 313, 331, fn. 6 (*Bland*))

The prosecutor argued defendant is liable for attempted murder of Officer Barrington under the kill zone theory.  Concerning the kill zone theory, the prosecutor argued:  "[The kill zone theory] instruction tells you about the liability for attempted murder for not only the intended target, the one you can see, the driver, but for anyone who might be in that car, in the passenger seat, backseat, it doesn't matter.  [¶]  And the defendant and the other shooters that night didn't care how many were in the car, they just shot."  Given this context, the Attorney General limits his appellate argument on sufficiency of the evidence to the kill zone theory, and we limit our consideration of defendant's sufficiency-of-evidence claim to the kill zone theory.

"[T]he kill zone theory for establishing the specific intent to kill required for conviction of attempted murder may properly be applied only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the

8

defendant intended to create a zone of fatal harm--that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death--around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm. [¶] In determining the defendant's intent to create a zone of fatal harm and the scope of any such zone, the jury should consider the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target. Evidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory." (*Canizales, supra,* 7 Cal.5th at p. 607.)

In *Canizales*, gang members Travion Bolden and Denzell Pride were at a neighborhood block party when Michael Rafael Canizales and KeAndre Windfield, from a rival gang, drove up and Windfield opened fire. (*Canizales, supra,* 7 Cal.5th at pp. 598-599.) Both Bolden and Pride took off running, Bolden running straight up the street and Pride zigzagging back and forth across the street and hiding behind a bus on the same side of the street where Leica Cooksey and some of her friends were listening to music and dancing. Bolden recalled that bullets were " 'going everywhere.' " Bolden and Pride were not hit, but Cooksey was struck in the abdomen a later died. Five shots had been fired from a distance of between 100 and 160 feet from Bolden, Pride, and Cooksey. (*Id.* at p. 600.)

The trial court in *Canizales* instructed the jury using CALCRIM No. 600 on the kill zone theory as a theory for convicting Canizales and Windfield of the attempted murder of Bolden. The trial court stated: " 'In order to convict a defendant of the attempted murder of . . . Bolden, the People must prove that the defendant not only

9

intended to kill . . . Pride but also either intended to kill . . . Bolden, or intended to kill everyone within the kill zone.' " (*Canizales, supra,* 7 Cal.5th at p. 601 and fn. 3, ellipses in original.)  The prosecutor argued to the jury that " '[i]f they're shooting at someone and people are within the zone that they can get killed, then you're responsible for attempted murder as to the people who are within the zone of fire.  Okay.  So there were times when [Bolden] told you that he was with [Pride], near [Pride], close proximity to [Pride].  So they're both within the zone of fire, the range [of] the bullets that are coming at them.' " (*Id.* at p. 601.)  The jury convicted Canizales of multiple crimes, including attempted murder of Bolden.  (*Ibid.*)

The California Supreme Court reversed the conviction for attempted murder of Bolden because there was insufficient evidence to support the kill zone theory. (*Canizales, supra*, 7 Cal.5th at p. 609.)  There was insufficient evidence "to support a reasonable inference that defendants intended to create a zone of fatal harm around a primary target." (*Id.* at p. 610.)  To support this conclusion, the Supreme Court reasoned: "[T]he evidence at trial showed that Windfield attacked his target by firing five bullets from a nine-millimeter handgun at a distance of either 100 or 160 feet away.  Moreover, the attack occurred at a block party on a wide city street, not in an alleyway, cul-de-sac, or some other area or structure from which victims would have limited means of escape. As Bolden described it, the bullets were 'going everywhere' and 'tingling through the gates' as he and Pride ran down the street away from the gunfire after the first shot was fired.  [¶]  Even accepting as more credible the prosecution's evidence that Windfield was 100 feet rather than 160 feet away from Pride and Bolden when he first fired in their direction, we conclude that a fact finder could not reasonably infer defendants intended to create a zone of fatal harm around Pride based on the record in this case.  The evidence presented here showed that from a substantial distance Windfield shot five bullets in the direction of a target who immediately ran down a city street after the first shot was fired.

10

This evidence was insufficient to support instruction on the kill zone theory." (*Id.* at p. 611.)

The California Supreme Court's decision in *Canizales* cited and relied on its prior decision in *Bland*: "In *Bland, supra,* 28 Cal.4th 313, this court expressly embraced the concept of a concurrent intent to kill as a permissible theory for establishing the specific intent requirement of attempted murder." (*Canizales, supra,* 7 Cal.5th at p. 602, italics omitted.) "*Bland* applied what is now commonly referred to as the 'kill zone' theory to uphold the attempted murder convictions in that case. The record there showed that the defendant and a fellow gang member approached a car in which a rival gang member was sitting in the driver's seat and opened fire with a .38-caliber handgun, shooting numerous rounds both into the vehicle and at the vehicle as it drove away. The driver was killed and his two passengers, who were not gang members, were wounded. (*Bland, supra,* 28 Cal.4th at p. 318.) We concluded that the evidence 'virtually compelled' a finding that even if the defendant primarily intended to kill the rival gang member, he also, concurrently, intended to kill the passengers in the car, or, at the least, intended to create a zone of fatal harm. (*Id.* at p. 333.)" (*Canizales*, at p. 603.)

The facts of this case are more like the facts in *Bland* than in *Canizales*. Here, defendant and his co-perpetrators waited to ambush the officers as they drove toward defendant's position. When Officer Weber saw one of the young men crouching by a trailer, defendant and the co-perpetrators opened fire while Officer Weber turned up a side street and accelerated. Defendant and the co-perpetrators fired a total of 26 shots. The officers were confined to the car, with Officer Weber the driver and Officer Barrington the passenger, and the car was within 20 to 30 yards from defendant and the co-perpetrators when they started firing. Only two of the bullets hit the car, in the bumper area, but the officers also heard bullets flying past the car.

Applying the test for the kill zone theory articulated in *Canizales*, we conclude this evidence was sufficient to sustain defendant's attempted murder convictions with respect

11

to Officer Barrington. The circumstances of the attack by defendant and his co-perpetrators on Officer Weber, including the firing of 26 shots at the car from as close as 20 to 30 yards, are such that the jury could conclude the only reasonable inference is the defendant intended to create a zone of fatal harm around Officer Weber. Officer Barrington, who was not the primary target, was located within that zone of harm. Even though defendant and his co-perpetrators in this case were not as close to the car as was the defendant in *Bland* when they started shooting, the number of shots and the aim, though not perfect aim, at the officers who were in a confined space support a reasonable inference defendant and his co-perpetrators intended to kill everyone in the car. Unlike the victims in *Canizales* who ran in different directions, Officers Weber and Barrington did not flee separately. Therefore, the evidence was sufficient to conclude defendant harbored the requisite specific intent to kill both Officer Weber and everyone within the zone of fatal harm. (See *Canizales, supra,* 7 Cal.5th at p. 607 [articulating kill zone theory].)

Defendant argues the evidence was insufficient to support the kill zone theory because (1) the weapons used (nine-millimeter and .40-caliber firearms) were not, in defendant's words, "notably high-powered weapon[s]"; (2) the shots were aimed low and wide of the passenger compartment of the car; (3) the location of the shooting did not create a trap for the officers; and (4) the shooting took place at a distance. While these are certainly arguments to make to a jury, they are not convincing as to the sufficiency of the evidence. The evidence that all five firearms were used, that they fired 26 shots with two bullets hitting the car and others flying past the car, and that the two officers were confined to the space of the car, was sufficient to establish the specific intent to kill Officer Barrington, even if he was not the primary target.

There was some evidence that defendant and the co-perpetrators did not know Officer Barrington was in the car. Based on that evidence, defendant argues he could have had no more than a reckless disregard for life instead of a specific intent to kill

Officer Barrington. This argument fails factually and legally. Factually, there was evidence that someone in the group of young men yelled, "Cops," when the officers drove by the group in the green Pontiac. And there was no evidence that Officer Barrington was hiding but instead was a passenger in the front seat of the car. These facts support a reasonable inference that defendant knew Officer Barrington was in the car, even if there was no testimony that anyone specifically saw Officer Barrington. And legally, a kill zone theory may apply even if the perpetrator did not know of the existence of the specific victim. The *Canizales* decision applies the kill zone theory to anyone within the zone of fatal harm. There is no discussion and no stated requirement that the defendant be aware of who is in the zone of fatal harm.

Granted, there was no question in *Canizales* or *Bland* regarding whether the defendants knew of the presence of the victim. However, our conclusion also finds support in *People v. Vang* (2001) 87 Cal.App.4th 554 (*Vang*), cited approvingly in *Canizales, supra*, 7 Cal.5th at page 610 and *Bland, supra,* 28 Cal.4th at page 330. In *Vang*, a man and his young daughter stood in an open doorway looking outside when shots were fired from a car. When the shooting ended, 50 bullet holes dotted the front of the residence. The man's wife and two other children were inside the residence at the time of the shooting. The girl at the door was killed, and the wife was injured. (*Vang, supra,* 87 Cal.App.4th at p. 558.) Minutes later, shots were fired at an apartment. A mother and four children were in the apartment. The mother and one of the children were injured. (*Ibid*.) Defendants were convicted of attempted murder of the occupants of the residences. (*Id.* at p. 563.) Rejecting the defendants' argument that they could not be convicted of attempted murder as to someone they did not know was in the residence because they did not specifically intend to kill those specific victims, the Court of Appeal stated: "In this case, defendants manifested a deliberate intention to unlawfully take the lives of others when they fired high-powered, wall-piercing, firearms at inhabited dwellings. The fact they could not see all of their victims did not somehow negate their

13

express malice or intent to kill as to those victims who were present and in harm's way, but fortuitously were not killed." (*Vang, supra,* 87 Cal.App.4th at p. 564.)

The citation to *Vang* in *Canizales* noted that relevant factors in determining whether the kill zone theory applied in that case were "the placement of the shots, the number of shots, and the use of high-powered wall-piercing weapons." (*Canizales, supra,* 7 Cal.5th at p. 610.) Those factors "created a reasonable inference that the defendants intended to kill every living being inside the residences at which they shot." (*Ibid.*) The *Canizales* decision did not articulate a requirement that the shooter must know how many people were in the zone of fatal harm. Neither is it appropriate here to apply a requirement that defendant knew how many people were in the car when he created the zone of fatal harm while targeting Officer Weber.

Defendant quotes the California Supreme Court decision in *People v. Smith* (2005) 37 Cal.4th 733, in which the court described the kill zone theory as allowing "a rational jury [to] conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others *he knew* were in the zone of fatal harm." (*Id.* at p. 746, italics added.) But this description of the kill zone theory in *Smith* is unhelpful to defendant because the court in that case concluded, for other reasons, that the kill zone theory was inapplicable. (*Id.* at pp. 745-746.) "[C]ases are not authority for propositions not considered." (*Fricker v. Uddo & Taormina Co.* (1957) 48 Cal.2d 696, 701.) And, in any event, *Canizales*, with its citation to *Vang*, is the California Supreme Court's most recent articulation of the kill zone theory.

Finally, defendant asserts there was a reasonable inference from the evidence that defendant and his co-perpetrators did not intend to kill Officer Barrington, given the factors we already discussed. He argues that although there was a reasonable inference that the shooters intended to kill but simply had bad aim, another reasonable inference is that they were not shooting to kill; and because the kill zone theory applies only if the only reasonable inference is that defendant intended to kill everyone in the kill zone to

14

ensure Weber's death, the existence of an alternative favorable inference precludes application of the kill zone theory in this case.

It is true that the trial court should provide the kill zone instruction to the jury "only in those cases where the court concludes there is sufficient evidence to support a jury determination that the *only* reasonable inference from the circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm." (*Canizales, supra,* 7 Cal.5th at p. 608, original italics.)  But we need only decide whether sufficient evidence supports that determination by the jury, not whether another reasonable inference was unavailable as a matter of law.  Here, as explained in our discussion of the evidence above, there is sufficient evidence for a jury to find no other reasonable inference than that defendant specifically intended to kill everyone within the zone of fatal harm.  Therefore, the evidence was sufficient to sustain the jury's convictions.

B

While the evidence was sufficient to support the convictions for attempted murder of Officer Barrington based on the kill zone theory, the trial court's instructions to the jury were prejudicially flawed.

In a discussion outside the presence of the jury concerning jury instructions, the prosecutor said she was relying on the kill zone theory to support the count alleging attempted murder of Officer Barrington.  Under that theory, Officer Weber was the primary target and Officer Barrington was the victim within the zone of fatal harm.  However, the trial court confused the primary target and the victim within the zone of fatal harm under the kill zone theory in its instruction to the jury.  The trial court said:  "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or kill zone.  [¶]  In order to convict the defendant of the attempted murder of Travis Weber [*sic*; should have been Robert Barrington], the People must prove that the defendant not only intended to kill Travis Weber but also

15

either intended to kill Robert Barrington, or intended to kill everyone within the kill zone. [¶] If you have a reasonable doubt whether the defendant intended to kill Travis Weber or intended to kill Robert Barrington by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Travis Weber [*sic*]." (See CALCRIM No. 600.)

This instruction hopelessly confused the application of the kill zone theory to the two officers. Even though Officer Weber was the primary target for purposes of the kill zone theory, the instruction identified him as both the primary target and the victim within the zone of fatal harm under the kill zone theory. This error rendered the instruction problematic because the jury, taking the trial court's instruction at face value, would not have been able to properly apply the kill zone theory to the counts alleging attempted murder of Officer Barrington.

In light of this instructional error, we must determine whether it is clear beyond a reasonable doubt that the error did not affect the jury's verdict.[2] (*Canizales, supra,* 7 Cal.5th at p. 615; *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705].) We conclude the convictions for attempted murder of Officer Barrington must be reversed under that standard.

The error in instructing on the kill zone theory was prejudicial under the circumstances of this case because of the mistake in the kill zone instruction and the prosecutor's argument giving improper guidance on the kill zone theory. The prosecutor referred to Officer Weber as the "intended target," rather than referring to Officer Weber as the "primary target," and argued that, if defendant intended to kill Officer Weber, he was also liable for attempted murder of anyone else in the car. The prosecutor said that

---

[2] As in *Canizales*, we need not determine whether a more stringent standard of prejudice applies because the error was prejudicial under the harmless-beyond-a-reasonable-doubt standard. (*Canizales, supra*, 7 Cal.5th at p. 615.)

16

the kill zone instruction "tells you about the liability for attempted murder for not only the *intended* target, the one you can see, the driver, but for anyone who might be in that car, in the passenger seat, backseat, it doesn't matter." (Italics added.) This is a mischaracterization of the kill zone theory as clarified in *Canizales* because the California Supreme Court made it clear that the kill zone theory is a theory of concurrent intent. In other words, to use the kill zone theory to convict a defendant of attempted murder for anyone within the kill zone, the jury must find that the defendant concurrently intended to kill everyone within the kill zone, not just the primary target. (*Canizales, supra,* 7 Cal.5th at pp. 602-603.) The prosecutor, however, suggested that the jury could find defendant guilty of attempted murder of Officer Barrington without finding defendant specifically intended to kill Officer Barrington.

Therefore, the trial court gave confusing and incomplete instructions to the jury concerning the application of the kill zone theory to the counts alleging attempted murder of Officer Barrington and the prosecutor's argument suggested the jury could find defendant guilty of attempted murder of Officer Barrington without necessarily finding that he specifically intended to kill Officer Barrington. Under these circumstances, we cannot say the erroneous instruction was harmless beyond a reasonable doubt.

Furthermore, while there was substantial evidence, as noted above, that defendant knew there were multiple police officers in the car, the jury may not have reached that conclusion based on other reasonable inferences. For example, Qweshawn Fox testified he did not see anyone in the car. And the prosecutor referred to Officer Weber in closing argument on the kill zone theory as "the [officer] you can see." Therefore, without proper guidance from the trial court and the prosecutor on how to apply the kill zone theory, the jury may have convicted defendant based on the kill zone theory without concluding defendant intended to kill Officer Barrington.

Because the evidence was sufficient to support a conviction for attempted murder of Officer Barrington based on the kill zone theory, but the jury instructions were

17

prejudicially flawed, we must reverse the convictions for attempted murder of Officer Barrington and remand for possible retrial on those counts. (See *People v. Eroshevich* (2014) 60 Cal.4th 583, 591 [retrial after reversal permitted except when evidence was insufficient].)

## II

Defendant next contends the evidence was insufficient to establish he knew the targets were police officers.

Both attempted murder of a peace officer (counts one and two) and assault with a semiautomatic firearm on a peace officer (counts five and six) include as an element of the crime that the perpetrator "knows or reasonably should know that the victim is a peace officer . . . ." (§§ 664, subd. (e); 245, subd. (d)(2).)

On June 26, 2015, defendant was in Peterson Park with other males. His picture was taken in a group on that occasion, with him making gang signs with his hands. Officer Weber testified that he was in plain clothes driving the unmarked green Pontiac with the driver's side window half-way down near Peterson Park at about 9:00 p.m. on June 26, 2015. He saw a group of about 10 males in the park in the same place where the group photographs with defendant had been taken. As Officer Weber's car approached the group, a male yelled, "Cops," and the group dispersed, walking away quickly in different directions. Fox testified defendant was with the group when Officer Weber passed them. Later, defendant and others shot at the green Pontiac.

This evidence was sufficient to sustain a jury finding that defendant knew he was shooting at an unmarked police car and reasonably should have known the occupants of the car were police officers. He was with the group when the green Pontiac passed and someone yelled, "Cops," notably a plural construction. Defendant shot at the green Pontiac.

Defendant unsuccessfully attempts to impeach this evidence. For example, he states there was no evidence either he or anyone in his group actually knew Officer

18

Weber and Officer Barrington were police officers. Defendant argues Fox, his accomplice, testified he did not hear anyone yell "Cops," and Fox did not know they were shooting at police officers.

Defendant further argues: "The evidence that someone yelled 'cops' may support the unidentified person's belief, but does not substantially support [defendant's] actual or constructive knowledge." That may have been a good argument for the jury, but in our review for substantial evidence, contrary evidence is not enough to negate the evidence summarized above supporting a reasonable inference defendant knew he was shooting at an unmarked police car. Reversal "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*Bolin, supra,* 18 Cal.4th at p. 331.)

Given our conclusion, we need not address additional evidence the Attorney General asserts to support a finding of substantial evidence.

### III

In addition, defendant claims the convictions on counts three (attempted murder of Robert Barrington) and four (attempted murder of Travis Weber) must be vacated because those counts are lesser-included offenses of counts one (attempted murder of peace officer, Robert Barrington) and two (attempted murder of peace officer, Travis Weber). Defendant also contends counts seven (assault with a semiautomatic firearm on Robert Barrington) and eight (assault with a semiautomatic firearm on Travis Weber) must be vacated because those counts are lesser-included offenses of counts five (assault with a semiautomatic firearm on a peace officer, Robert Barrington) and six (assault with a semiautomatic firearm on a peace officer, Travis Weber). The Attorney General agrees. We also agree that the convictions for the lesser-included offenses must be vacated, with the exception that we will not vacate defendant's conviction on count three (attempted murder of Robert Barrington) because we have determined counts one and three, which

19

are the attempted murder crimes with Robert Barrington as the victim, must be reversed and remanded for further proceedings.

"Section 954 sets forth the general rule that defendants may be charged with and convicted of multiple offenses based on a single act or an indivisible course of conduct." (*People v. Pearson* (1986) 42 Cal.3d 351, 354, abrogated on another ground by *People v. Vidana* (2016) 1 Cal.5th 632, 651.) "However, an exception to this general rule allowing multiple convictions prohibits multiple convictions based on necessarily included offenses." (*People v. Medina* (2007) 41 Cal.4th 685, 701.) " '[A] lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser. [Citations.]' " (*People v. Smith* (2013) 57 Cal.4th 232, 240.)

There is no dispute that the convictions for attempted murder (§§ 664/187, subd. (a) -- counts three and four) and assault with a semiautomatic firearm (§ 245, subd. (b) -- counts seven and eight) were lesser-included offenses of attempted murder of a peace officer (§ 664, subd. (e) -- counts one and two) and assault with a semiautomatic firearm on a peace officer (§ 245, subd. (d)(2) -- counts five and six), respectively. The lesser-included offenses were based on the same conduct as the greater offenses, and the greater offenses included all elements of the lesser offenses, plus an element that the victim was a peace officer. In other words, defendant necessarily committed attempted murder and assault with a semiautomatic firearm when he committed attempted murder of a peace officer and assault with a semiautomatic firearm on a peace officer.

Accordingly, we will vacate the convictions on the lesser-included offenses (counts four, seven, and eight) with the exception of count three, as we have explained.

IV

Defendant further asserts the evidence was insufficient to sustain his conviction on the substantive gang crime (active participation in a criminal street gang) and the true

20

findings that the crimes were committed for the benefit of a gang. Specifically, he argues there was insufficient evidence the Flyboys engaged in any of the enumerated primary activities under section 186.22, subdivision (e) and that defendant committed the present crimes for the benefit of his gang. We conclude there was sufficient evidence of the Flyboys' primary activities and of defendant's purpose to commit the crimes for the benefit of his gang.

As to both the substantive gang crime (§ 187.22, subd. (a)) and the gang enhancements (§ 187.22, subd. (b)), defendant argues the evidence was insufficient because the prosecution did not present evidence of the Flyboys' primary activities and, therefore, failed to show that the Flyboys are a criminal street gang.

A

" '[C]riminal street gang' means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f).) The enumerated crimes include prohibited firearm possession, assault with a deadly weapon, and homicide. (§ 186.22, subd. (e)(1), (3), (31-33).)

The term "primary activities" means "the commission of one or more of the statutorily enumerated crimes [must be] one of the group's 'chief' or 'principal' occupations. [Citation.] That definition would necessarily exclude the occasional commission of those crimes by the group's members." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323 (*Sengpadychith*).) "Sufficient proof of the gang's primary activities might consist of evidence that the group's members consistently and repeatedly have committed criminal activity listed in the gang statute. Also sufficient might be expert

21

testimony . . . [the gang] . . . was primarily engaged in . . . statutorily enumerated felonies." (*Id.* at p. 324, italic omitted.)

Defendant emphasizes that the prosecution did not ask the gang experts what the primary activities of the Flyboys were by using the words "primary activities." Defendant also argues that, although there was evidence of the Flyboys' activities, the evidence was insufficient to establish those activities were primary activities.

While the primary activities of a criminal street gang may be proved by expert witness testimony, the jury may also make reasonable inferences about the gang's primary activities from the evidence of their activities. (*Sengpadychith, supra,* 26 Cal.4th at p. 324.) In other words, there is no requirement that the prosecution call an expert witness to testify concerning the primary activities of the gang if there is other evidence of those primary activities. "Evidence of past or present conduct by gang members involving the commission of one or more of the statutorily enumerated crimes is relevant in determining the group's primary activities. Both past and present offenses have some tendency in reason to show the group's primary activity (see Evid. Code, § 210) . . . ." (*Sengpadychith, supra,* 26 Cal.4th at p. 323.)

Consistent commission of the enumerated crimes supports a finding that those enumerated crimes are a primary activity of the criminal street gang. (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1224-1225.) For example, in *Vy*, the court wrote: "No evidence was presented that [the gang] committed any of the 25 predicate crimes enumerated in section 186.22, subdivision (e) in either 1998 or 1999. There were, however, three predicate crimes . . . that were committed by [the gang] over a short period of time in 2000." (*Ibid.*) The court concluded: "Viewing the evidence 'in the light most favorable to the prosecution' [citation], we find that it is sufficient to satisfy the 'primary activities' prong of section 186.22[, subd.] (f). The evidence here shows the existence of three serious, violent crimes by [the] gang members that took place over a period of less than three months." (*Id.* at p. 1225.)

Here, Detective Ryan Taiariol of the Stockton Police Department testified as an expert on African American criminal street gangs. He testified that the Flyboys were documented as a criminal street gang in 2010, after which police "continued to see an increase in their violence resulting in many homicides and assault with deadly weapon-type cases, robberies, and possession of firearms." There are 56 documented members of the Flyboys, with an additional 12 associates and another 20 or 30 unknown gang members active in Stockton.

The prosecutor mentioned the term "primary activities," but she proceeded to the more general question of what crimes the Flyboys commit. Detective Taiariol responded: "I have known them to commit everything from narcotics for sales, possession of firearms, burglaries, auto theft, robberies, assault with deadly weapon, firearm and -- not firearm, homicides."

There was evidence that the Flyboys share and pass around firearms. Some firearms are obtained through robberies and burglaries. While Flyboys are not committing crimes every minute of every day, typically the members do not have jobs. Notably, defendant had only two weeks of employment history. In 2012, a Flyboy was involved in a gun battle relating to a person labeled a snitch. In that gun battle, the Flyboy shot an innocent bystander and was later convicted of the homicide. In 2014, Flyboys gang members possessed firearms and later were convicted of possessing the firearms. Also in 2014, a wiretap investigation uncovered a conspiracy to commit murder among Flyboys. In 2015, Flyboys gang members possessed an Uzi-type firearm and were later convicted of possessing that firearm.

This evidence was sufficient to show the various primary activities of the Flyboys. Detective Taiariol said the Flyboys engaged in "an increase in their violence resulting in many homicides and assault with deadly weapon-type cases, robberies, and possession of firearms." He also testified concerning additional incidents of firearm possession, assaults with deadly weapons, and a homicide. This testimony established that prohibited

23

firearm possession, assaults with deadly weapons, and homicides (§ 186.22, subd. (e)(1), (3), (31-33)) were among the Flyboys' primary activities because they are the gang's chief and principal occupations. (*Sengpadychith, supra,* 26 Cal.4th at p. 323.)

B

As for the gang enhancements, defendant argues the evidence was not sufficient to sustain them because Detective Taiariol's opinion that the crimes were committed for the benefit of the gang was not based on a hypothetical question. We need not address whether the prosecutor properly asked the detective a hypothetical question based on the facts of this case (see *People v. Vang* (2011) 52 Cal.4th 1038), because the evidence supported the jury's finding that the crimes were committed for the benefit of the gang even without the detective's opinion. Thus any error under *Vang* was harmless.

The gang enhancement applies if a defendant committed the crime "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).)

The prosecutor did not craft a hypothetical question based on the facts of this case to ask Detective Taiariol for an opinion whether defendant committed the crimes for the benefit of the Flyboys. Instead, the prosecutor asked directly for the detective's opinion concerning whether Detective Taiariol believed, based on the testimony and other evidence presented at trial, that the attack on the officers in this case was committed for the benefit of the Flyboys criminal street gang. Detective Taiariol responded affirmatively.

Defendant claims Detective Taiariol's testimony cannot be sufficient to establish that the crimes were committed for the benefit of the gang because the testimony invaded the province of the jury. He argues: "The detective's testimony short-circuited the jury's duty to analyze the truth of the facts underlying his opinion by telling them that the facts at trial supported the enhancement." We disagree that any error in asking the question in

24

a direct form was prejudicial because the gang expert's testimony that defendant committed the crimes for the benefit of the gang was cumulative of other evidence.

Defendant cites *People v. Ochoa* (2009) 179 Cal.App.4th 650, 664 in support of his argument, but *Ochoa* is distinguishable. As this court previously explained, "[i]n [*Ochoa*], the defendant did not call out a gang name, display gang signs, wear gang clothing or engage in gang graffiti to take credit for the crimes. There was also no evidence the crimes were committed in gang territory or that of its rival. [Citation.] Nor was there any evidence that the defendant committed the crimes with a gang member. [Citation.]" (*People v. Ewing* (2016) 244 Cal.App.4th 359, 381.) Here, on the other hand, the evidence shows defendant was with his fellow gang members in the territory they claimed as a gang when they planned and executed the ambush of the police officers. For these reasons, the gang expert's testimony that defendant committed the crimes for the benefit of the gang was cumulative.

The evidence of defendant's gang purpose and gang association was plentiful. The Flyboys claimed the territory where the attack occurred. Defendant and the fellow gang members with him knew there were police officers in the car. The Flyboys commonly engage in criminal activity, such as prohibited firearm possession, assaults with a deadly weapon, and homicides, so the jury could reasonably infer that the gang members did not want police officers observing them. The Flyboys present with defendant planned and executed the attack on the police officers together. The evidence was sufficient for the jury to draw its own reasonable inference that defendant committed the crimes "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members" (§ 186.22, subd. (b)(1)) even without testimony of a gang expert in response to a hypothetical question.

The evidence was sufficient to support both the conviction for the substantive gang crime (§ 186.22, subd. (a)) and the gang enhancements (§ 186.22, subd. (b)).

V

The trial court imposed a consecutive unstayed determinate term of eight months for the conviction for active participation in a criminal street gang (count ten).  Defendant contends punishment for active participation in a criminal street gang must be stayed under section 654 because it is based on the same conduct alleged in other counts.  The Attorney General agrees.  Although we will vacate the entire sentence due to our reversal on counts one and three, we nevertheless consider and resolve this contention to provide guidance on remand.

An element of active participation in a criminal street gang, the substantive gang crime, is that the defendant promoted, furthered, or assisted in felonious criminal conduct.  (§ 186.22, subd. (a).)  Here, the jury was instructed that the alleged felonious conduct supporting the substantive gang crime was the crimes charged against defendant.  Section 654 prohibits punishment for both a crime requiring intentional commission of underlying felonious conduct and for the actual underlying felonious conduct itself.  (*People v. Mesa* (2012) 54 Cal.4th 191, 197-198, 200-201.)  Therefore, section 654 prohibits punishment for both the substantive gang crime and the other crimes charged.  The trial court must, therefore, stay punishment on count ten when it resentences.

VI

Defendant contends the judgment must be reversed because, without a showing of manifest need, a leg restraint was used on him at trial to restrict his movements.

Before trial, defendant made a motion seeking not to be restrained during trial.  The trial court ruled:  "We do not do physical restraints in the presence of the jury.  We do a leg brace.  This is attempted murder.  We bring him over here before the jury's present.  He's seated when the jury is here, and when the jury leaves, he's walked out.  So they will not see him in any kind of restraint at all."  As defendant acknowledges, there is no indication in the record that the jury ever observed the leg restraint.  When defendant testified, he was seated on the witness stand while the jury was outside the courtroom so

26

that the jury did not see him walking with the leg restraint. After the jury entered the courtroom, he was sworn in as a witness while sitting.

State and federal constitutional principles prohibit restraint of a defendant in the courtroom if the jury can see the restraint unless the trial court exercises its discretion in finding the restraint is justified in that particular instance. (*Deck v. Missouri* (2005) 544 U.S. 622, 629 [161 L.Ed.2d 953].) Under state constitutional principles, "[a] criminal defendant cannot be physically restrained in the jury's presence unless there is a showing of manifest need for such restraints. [Citation.]" (*People v. Anderson* (2001) 25 Cal.4th 543, 595 (*Anderson*).) However, "courtroom shackling, even if error, was harmless if there is no evidence that the jury saw the restraints, or that the shackles impaired or prejudiced the defendant's right to testify or participate in his defense. [Citations.]" (*Id.* at p. 596.)

Defendant asserts the trial court did not make a finding of manifest need for the leg restraint. The Attorney General agrees no showing of manifest need was made in the trial court but argues that using the restraint was harmless. We proceed directly to a discussion of prejudice.

Here, the jury could not see the leg restraint, but defendant argues that the leg restraint hindered his defense in two ways: he was required to take the stand for his testimony before the jury entered the courtroom, as did the only other in-custody witness, and the leg restraint restricted his movements at the counsel table, thus inhibiting his ability to assist counsel at trial. Defendant's argument that he was required to take the witness stand before the jury entered the courtroom like the only other in-custody witness, Qweshawn Fox, is not supported because defendant's citation to the record does not reveal the circumstances in which Fox took the witness stand. Instead, the citation only reveals that Fox testified that he was in custody. Therefore, the record does not fully support defendant's argument. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1031 [contentions not supported by record are without merit].) Also, the record does not

27

support defendant's speculation that having the leg restraint inhibited his ability to assist counsel during trial.

In any event, any error in ordering defendant to wear a leg restraint during the trial was harmless because there is no indication of prejudice in the record. (*Anderson, supra,* 25 Cal.4th at p. 596.)

VII

Defendant, who was 18 years old at the time of the crimes, contends we must remand for a hearing under *People v. Franklin* (2016) 63 Cal.4th 261 to give him an opportunity to present evidence relevant to an eventual youthful offender parole hearing under section 3051. We need not consider this contention because defendant will have an opportunity on remand to present evidence relevant to an eventual youthful offender parole hearing under section 3051.

VIII

Defendant also argues we must remand to the trial court to allow it to exercise its newly-enacted discretion concerning whether to strike the firearm enhancements under section 12022.53. We need not consider this contention because the trial court will have the opportunity to exercise its newly-enacted discretion when defendant is resentenced on remand.

IX

Finally, defendant contends he is entitled to one additional day of presentence custody credit under section 2900.5, subdivision (a). We need not consider this contention because defendant will have the opportunity to raise it when he is resentenced on remand.

DISPOSITION

The convictions on counts one (attempted murder of a peace officer, Robert Barrington) and three (attempted murder of Robert Barrington) are reversed and remanded. The convictions on counts four (attempted murder of Travis Weber), seven

28

(assault with a semiautomatic firearm on Robert Barrington), and eight (assault with a semiautomatic firearm on Travis Weber), as well as the enhancement findings associated with those counts, are vacated. In addition, defendant's sentence is vacated. The judgment is affirmed in all other respects, and the matter is remanded for further proceedings consistent with this opinion.

                                        /S/
                                        MAURO, Acting P. J.


We concur:


        /S/
DUARTE, J.


        /S/
RENNER, J.

29